[Civ. No. 48942. First Dist., Div. Four. Mar. 18, 1983.]

VIRGIE FOY et al., Plaintiffs and Appellants, v.
BRADLEY GREENBLOTT et al., Defendants and Respondents.

COUNSEL

Louis C. Castro and Castro & Iwama for Plaintiffs and Appellants.

Jeffrey O. Brown, Farbstein, Brown & Pillsbury, Eugene P. LaMore, Michael G. Ackerman, Popelka, Allard, McCown & Jones, John R. Williams, Hession, Creedon, Hamlin, Kelly, Hanson & Williams, Bruce A. Werlhof and Inge Wagner for Defendants and Respondents.

OPINION

CHRISTIAN, J.—Virgie Foy, an incompetent person, and Reffie Foy, her minor child, appeal from a judgment on demurrer dismissing an action by which damages were sought on allegations that Virgie became pregnant, and Reffie was born, because of negligence on the part of respondents Bradley Greenblott, M.D., Richard Slade, M.D., Ronald Diebel, M.D., San Jose Care and Guidance Center, and the County of Santa Clara.

Appellants alleged that Virgie Foy had been adjudicated a gravely disabled and incompetent person under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.). The superior court appointed the Santa Clara County public guardian conservator of Virgie. The order of appointment denied the conservatee the rights to consent to or to refuse any medical treatment related or unrelated to her gravely disabled condition. The county placed Virgie in the San Jose Care and Guidance Center, a private, locked mental health facility licensed by the state. Defendants Greenblott, Slade and Diebel were plaintiffs' attending and treating physicians at that facility.

The complaint recites that defendants were aware that Virgie was a "gravely disabled person with a medical history of irresponsible sexual behavior toward patients and other persons." Although the care and guidance center maintained both male and female patients, defendants failed to supervise plaintiff or to provide her with contraceptive devices or counseling. As a proximate cause of this alleged negligence, Virgie Foy became pregnant. Further, defendants failed to discover or to diagnose her pregnancy until two weeks before she delivered. Had the pregnancy been "timely discovered or diagnosed," plaintiffs believe the county as conservator "would have arranged for . . . Virgie Foy to undergo a therapeutic abortion." Virgie Foy gave birth to Reffie in due time.

Appellants allege they have each been "injured in body and mind" and suffered great pain and suffering as a consequence of the pregnancy of Virgie and the ultimate birth of Reffie. Recovery for various future costs "associated with

the growth and care of Reffie" are sought. Appellants also allege that respondents' negligent failure to prevent the birth of Reffie has deprived mother and child of "fully knowing, caring for, loving and enjoying" one another. Finally, appellants seek awards of exemplary damages.

## I.

 Appellants do not seek to hold the county vicariously liable for the alleged malpractice of defendant physicians and the care and guidance center. Instead, they assert that the public guardian was personally negligent in his selection of the center for the conservatee's placement and in his failure to monitor the care and supervision received by her there.

The county claims immunity under various provisions of the California Tort Claims Act (Gov. Code, § 810 et seq.). It is clear that the conservator's selection of a custodian is a complex, discretionary decision immunized under section 820.2. (See *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 748-749 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) However, the public guardian had a continuing responsibility to see that Virgie received adequate care at the center and the performance of this duty necessarily involved ministerial acts and omissions not shielded by section 820.2. (See *Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 826 [164 Cal.Rptr. 264].) Such conduct is, however, protected in the circumstances here alleged by another part of the statute. Plaintiffs' actions are barred by section 854.8, which provides in relevant part: "(a) Notwithstanding any other provision of this part, except as provided in this section and in Sections 814, 814.2, 855, and 855.2, a public entity is not liable for:

"(1) An injury proximately caused by a patient of a mental institution.

"(2) An injury to an inpatient of a mental institution."

Appellants' injuries are of the type described. The exception in subdivision (d) of the statute for medical malpractice of public employees is inapplicable as appellants' actions are based on the conduct of the conservator, rather than that of the private medical personnel at the center. Appellants seek to avoid section 854.8 by arguing that the care and guidance center is not a "mental institution" because it is privately operated; this characterization is meritless. "Mental institution" refers to any "county psychiatric hospital" as that term is defined in Welfare and Institutions Code section 7100. (See Gov. Code, §§ 854.2, 854.3.) That statute in turn expressly includes private facilities with which the county contracts for the provision of treatment to conservatees. (Welf. &

Inst. Code, §§ 7100, 7103.) As section 854.8 is dispositive of the county's exposure to appellants' actions, it is unnecessary for us to consider whether Government Code section 856, subdivision (a), or Welfare and Institutions Code section 5358.1 provide alternative grounds for immunity here.

II.

Virgie and Reffie seek general and punitive damages for the deprivation of a normal parent-child relationship. Appellants insist these claims are distinguishable from actions for loss of parental or filial consortium, as they seek recovery for the creation of an impaired relationship rather than injury to an existing one.

Losses of parental or filial consortium are not actionable. "[T]he inadequacy of monetary damages to make whole the loss suffered, considered in light of the social cost of paying such awards, constitutes a strong reason for refusing to recognize the asserted claim." (*Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441, 447 [138 Cal.Rptr. 302, 563 P.2d 858]; also see *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871].) The distinction claimed by plaintiffs actually aggravates the problems of ascertaining damages as these actions would require comparison of plaintiffs' impaired relationship with a hypothetical normal parent-child relationship rather than with any actual relationship existing before the tort.

The hazards of awarding general damages for the creation of an undesirable situation, rather than for injury to preexisting interest, received attention in *Turpin* v. *Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954]. The *Turpin* court recognizes in an infant a cause of action for "wrongful life" in certain circumstances. However, only special damages, such as medical and educational expenses associated with the infant's disability, are recoverable. "[W]ith respect to the child's claim for pain and suffering or other general damages—recovery should be denied because (1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner." (*Turpin* v. *Sortini, supra,* 31 Cal.3d 220, 234-235.) Just as general damages are not available to compensate a plaintiff for her own existence, they cannot be awarded for the creation of an impaired parent-child relationship in place of no relationship at all. The court acted correctly when it sustained without leave to amend respondents' demurrers to these causes of action.

## III.

The most critical items in the complaint are, of course, the actions of Virgie Foy for "wrongful birth" and of Reffie Foy for "wrongful life."[1] We examine first the former of these.

■ California law now permits a mother to hold medical personnel liable for their negligent failure to prevent or to terminate a pregnancy. In *Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884], the appellate court rejected defendant's contentions that "pregnancy, the ensuing birth of a child, and the costs and expenses of the delivery and rearing of a child, are not legally cognizable injuries." (*Custodio* v. *Bauer, supra,* 251 Cal.App.2d 303, 310.) The court refused to impose "public policy" limitations on the types of damages recoverable but held that ordinary tort principles of compensation for "all the detriment proximately caused" should govern. (*Custodio* v. *Bauer, supra,* 251 Cal.App.2d 303, 325; see Civ. Code, § 3333.) Similarly, in *Stills* v. *Gratton* (1976) 55 Cal.App.3d 698 [127 Cal.Rptr. 652], a judgment of nonsuit was held to be improper in a wrongful birth action based upon the negligent performance of a therapeutic abortion. These decisions do not specify recoverable damages; they hold simply that should the plaintiff prevail she is entitled to "full compensation" under "ordinary tort principles." (*Stills* v. *Gratton, supra,* 55 Cal.App.3d 698, 709.) In each case, the fact that the infant had been born healthy and had no apparent hereditary defects was no bar to the suit. (*Custodio* v. *Bauer, supra,* 251 Cal.App.2d 303, 309, fn. 3; *Stills* v. *Gratton, supra,* 55 Cal.App.3d 698, 703.) Finally, although the Supreme Court has had no occasion to rule upon the validity of wrongful birth actions, in the course of its opinion in *Turpin* v. *Sortini, supra,* 31 Cal.3d 220, 225-227, the court discusses with apparent approval *Custodio, Stills* and several out-of-state opinions recognizing such actions.

In light of *Custodio, Stills* and *Turpin,* it is clear that Virgie's action is not barred by failure to allege a legally cognizable injury. Nonetheless, in *Custodio* and *Stills,* the plaintiffs sought the services of defendants for the express purpose of preventing conception or birth. Here, plaintiff was adjudicated as gravely disabled and placed by her conservator, the public guardian, in the care and guidance center. There is no allegation that she actively sought from defendants contraceptive or gynecological care; indeed, it is Virgie's position that she lacked capacity to make any decisions pertinent to medical treatment. Consequently, *Custodio* and *Stills* provide little guidance in determining the scope of the duty owed plaintiff by the center and the physicians under these circumstances.

---

[1]This terminology—" 'wrongful life' for all actions brought by children and 'wrongful birth' for all actions brought by parents"—has been adopted by the California Supreme Court. (*Turpin* v. *Sortini, supra,* 31 Cal.3d 220, 225, fn. 4.)

Virgie contends that respondents should have given her contraceptive counseling and medication, and if necessary, "supervised" her contacts with men to see that she did not engage in sexual relations. Moreover, she urges, had the physicians made a timely diagnosis of her pregnancy, the conservator would have (and should have) ordered the performance of an abortion. Further, of course, even were the pregnancy not aborted, early diagnosis would have permitted her to receive prenatal care throughout the term. Plaintiff has framed this suit in the form of a medical malpractice action. Nonetheless, it is well established that the threat of tort liability can frustrate the exercise of civil rights as effectively as direct governmental sanctions. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 389-391 [17 L.Ed.2d 456, 467-469, 87 S.Ct. 534]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 265 [11 L.Ed.2d 686, 697-698, 84 S.Ct. 710, 95 A.L.R.2d 1412].) Consequently, we must examine the "precautionary" and remedial measures recommended by Virgie in the context of her own constitutional and statutory rights of privacy, freedom of association, reproductive choice and informed consent to medical treatment.

Virgie's argument is that under no circumstances should a woman adjudicated as incompetent be permitted to bear a child. The courts and legislatures do not subscribe to that theory of eugenics. ■ A conservatee or other institutionalized mental patient enjoys "the same legal rights and responsibilities guaranteed all other persons" except those which are specifically denied her by law or by the order authorizing commitment or conservatorship. (Welf. & Inst. Code, §§ 5325.1, 5327, 5357.) One such right of a "fundamental nature" is "a woman's right to freedom from unwarranted governmental intrusion and to choose whether to bear children . . . ." (*Maxon* v. *Superior Court* (1982) 135 Cal.App.3d 626, 632 [185 Cal.Rptr. 516]; see *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52, 67-75 [49 L.Ed.2d 788, 803-808, 96 S.Ct. 2831]; *Roe* v. *Wade* (1973) 410 U.S. 113, 153 [35 L.Ed.2d 147, 177, 93 S.Ct. 705]; *Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 280-281 [172 Cal.Rptr. 866, 625 P.2d 779].) Consequently, courts have been unwilling to give conservators and other guardians free rein to substitute their own judgment for that of mentally disabled patients in matters affecting reproductive rights, such as sterilization operations. (*Maxon* v. *Superior Court, supra,* 135 Cal.App.3d 626; *Guardianship of Tulley* (1978) 83 Cal.App.3d 698 [146 Cal.Rptr. 266], cert. den. (1979) 440 U.S. 967 [59 L.Ed.2d 783, 99 S.Ct. 1519]; *Guardianship of Kemp* (1974) 43 Cal.App.3d 758 [118 Cal.Rptr. 64, 74 A.L.R.3d 1202]; see also *Stump* v. *Sparkman* (1978) 435 U.S. 349 [55 L.Ed.2d 331, 98 S.Ct. 1099]; *Matter of A.W.* (1981) 637 P.2d 366.) *Maxon,* for instance, permits a conservator to obtain court authorization for an operation which will result in the sterilization of the conservatee only where he can show by clear and convincing evidence that the operation is medically necessary for the protection of the patient's

life. (*Maxon* v. *Superior Court, supra,* 135 Cal.App.3d 626, 633-634.) The hysterectomy sought in *Maxon* was permissible in that its purpose was not the suspect one of "preventing mentally defective persons from procreating"; sterilization was simply a consequence of an operation necessary for the treatment of a malignant disease. (*Maxon* v. *Superior Court, supra,* 35 Cal.App.3d 626, 633.) In contrast, the complaint here does not allege any fact other than the status of Virgie as a conservatee to justify overriding her own wishes in reproductive matters. "If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (*Eisenstadt* v. *Baird, supra,* 405 U.S. 438, 453 [31 L.Ed.2d 349, 362].) Appellants' thesis is that respondents should be subject to tort liability for failure to pursue vigilantly this disfavored goal. Further, some of the means—"precautionary measures"— appellants contend respondents should have employed in support of this objective independently infringe legal rights retained by institutionalized persons under terms of section 5325.1.

Appellants suggest "extra supervision" of the conservatee's contacts with men as one means of insuring she does not conceive. Every institutionalized person is entitled to individualized treatment under the "least restrictive" conditions feasible—the institution should minimize interference with a patient's individual autonomy, including her personal "privacy" and "social interaction."[2] (Welf. & Inst. Code, § 5325.1, subds. (a), (b), (g); § 5358, subds. (a), (c).) Obviously, effective hospital policing of patients would not only deprive them of the freedom to engage in consensual sexual relations, which they would enjoy outside the institution, but would also compromise the privacy and dignity of all residents. *Williams* v. *State* (1965) 46 Misc.2d 824 [260 N.Y.S.2d 953], affd. (1968) 30 App.Div.2d 611 [290 N.Y.S.2d 263], and *McCandless* v. *State* (1957) 3 App.Div.2d 600 [162 N.Y.S.2d 570], affd. (1958) 4 N.Y.2d 797 [173 N.Y.S.2d 30; 149 N.E.2d 530] are to be distinguished; they involved mental hospitals' failures to protect patients from sexual assault rather than to

---

[2]Congress has also declared that all state mental health programs should provide treatment in the least restrictive environment. (Mental Health Systems Act, 42 U.S.C. § 9501(1)(A), (F), (G), (J).) Numerous courts have found a federal constitutional right to the least restrictive conditions of institutional treatment. (See *Wyatt* v. *Stickney* (M.D.Ala. 1972) 344 F.Supp. 373, affd. *sub nom. Wyatt* v. *Aderholt* (5th Cir. 1974) 503 F.2d 1305; *Davis* v. *Balson* (N.D. Ohio 1978) 461 F.Supp. 842; *Gary W.* v. *State of La.* (E.D.La. 1976) 437 F.Supp. 1209.) (Thus far the Supreme Court has declined to rule on this question. [*Youngberg* v. *Romeo* (1982) 457 U.S. 307, 313, fn. 14 (73 L.Ed.2d 28, 36, 102 S.Ct. 2452, 2457); *Pennhurst State School* v. *Halderman* (1981) 451 U.S. 1, 31 (67 L.Ed.2d 694, 716, 101 S.Ct. 1531).] It has, however, stated that "reasonably non-restrictive confinement conditions" are constitutionally mandated. [*Youngberg* v. *Romeo, supra,* 457 U.S. 307, 324 (73 L.Ed.2d 28, 43, 102 S.Ct. 2452, 2463)].) In one such least restrictive treatment case, the court included "suitable opportunities for the patient's interaction with members of the opposite sex" among the "minimum constitutional standards for adequate treatment." (*Wyatt* v. *Stickney, supra,* 344 F.Supp. 373, 379-381; see also *Davis* v. *Watkins* (N.D.Ohio 1974) 384 F.Supp. 1196.)

prevent voluntary sexual relations. As appellants point out, under some circumstances, as where a hospital assumes care and custody of a suicidal patient, it does have a responsibility to protect that patient fom her own voluntary acts. (See *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519]; *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465 [62 Cal.Rptr. 577, 432 P.2d 193]; *Abille* v. *United States* (N.D.Cal. 1980) 482 F.Supp. 703 [applying Alaska law].) However, in analogizing respondents' omissions here to cases of self-inflicted injury or death, appellants' argument simply assumes its own conclusion—that voluntary sexual conduct is an objective harm which the patient must be spared.

Appellants maintain timely diagnosis of Virgie's pregnancy would have permitted (or even required) the conservator to order performance of a therapeutic abortion. ■ Generally, every person has a right arising out of both common law and the state constitutional guarantee of privacy to give or withhold informed consent with respect to a proposed medical treatment. (See *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242-244 [104 Cal.Rptr. 505, 502 P.2d 1]; 65 Ops. Cal.Atty.Gen. 417 (1982); 60 Ops.Cal.Atty.Gen. 375 (1977); 58 Ops.Cal. Atty.Gen. 849 (1975).) Nonetheless, in placing an individual under conservatorship, a court may, as in this case, specifically suspend the right to refuse medical treatment and empower the conservator to make informed consent decisions. (Welf. & Inst.Code, §§ 5357, subds. (d) and (e); 5358, subd. (b).) However, before the conservator may consent to surgery, he must still, except in emergency situations, apply to the court for specific authorization. (§§ 5358, subd. (b); 5358.2.) Where a conservator is uncertain whether his existing authorization from the court applies to a particular proposed treatment, he should resolve his doubts in favor of making further application to the court. (60 Ops.Cal.Atty.Gen. 375.)

By this review of the legal rights affected by the procedures appellants urge respondents should have followed, we do not indicate that mental health personnel can never restrict consensual sexual activities of a patient or prescribe contraceptives over a patient's objections without infringing civil rights. Nor do we suggest that a conservator is precluded from obtaining court authorization for an abortion in a nonlife-threatening situation. (See *Matter of A.W., supra,* 637 P.2d 366, 369-370.) Nonetheless, the statutes and case law discussed above do more than define the minimum patients' rights, which mental health professionals are obliged to respect; they also express a public policy of maximizing patients' individual autonomy, reproductive choice, and rights of informed consent. ■ Within the considerable range of discretion left to them, mental health professionals are expected to opt for the treatments and conditions of confinement least restrictive of patients' personal liberties. The threat of tort liability for insufficient vigilance in policing patients' sexual conduct and in second-guessing their reproductive decisions would effectively reverse these incentives and encourage mental hospitals to accord patients

only their minimum legal rights. Consequently, these aspects of respondents' conduct are not actionable.

Two of respondents' alleged omissions did not free Virgie from intrusions into personal matters but actually deprived her of the opportunity to exercise her right of reproductive choice. Appellants allege that respondents failed to make contraceptive counseling and medication available to her. Further, as her condition was not diagnosed until the final month, there was no opportunity to abort the pregnancy. The policy concerns explored above do not shield respondents from liability for acts which frustrate a patient's rights of reproductive choice. (See *Call* v. *Kezirian* (1982) 135 Cal.App.3d 189, 192-193 [185 Cal.Rptr. 103].) We cannot say, as a matter of law, either that respondents owed no duty to Virgie in these areas, or that the risk of injury to her was not foreseeable.

The degree of the hospital's duty of care is measured by the ability of the patient to care for herself. (*Murillo* v. *Good Samaritan Hospital* (1979) 99 Cal.App.3d 50 [160 Cal.Rptr. 33].) Here, Virgie was admitted as a result of a judicial determination that she was incapable of providing for her own basic personal and medical needs. (Welf. & Inst. Code, § 5008, subd. (h); *Conservatorship of Davis* (1981) 124 Cal.App.3d 313 [177 Cal.Rptr. 369]; *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281 [144 Cal.Rptr. 241].) As a mental patient, she had a right to receive "prompt medical care and treatment" and protection from harm. (§§ 5325.1, subds. (c), (d); 5350.1; 5352.6.) Further, there is certainly nothing novel about the proposition that medical malpractice liability may be grounded upon failure to diagnose a condition or to warn a patient of risks. (*Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902]; *Call* v. *Kezirian, supra,* 135 Cal.App.3d 189; *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223 [166 Cal.Rptr. 443]; *Derrick* v. *Ontario Community Hospital* (1975) 47 Cal.App.3d 145 [120 Cal.Rptr. 566]; *Wohlgemuth* v. *Meyer* (1956) 139 Cal.App.2d 326 [293 P.2d 816].) Various respondents argue, on the basis of facts outside the complaint, that they had little opportunity to examine Virgie, that contraceptives are either dangerous or ineffective, and that they could not reasonably have detected her pregnancy until the final month. (For instance, respondent Slade asserts that scientific studies have proven contraceptive devices to be carcinogenic.) All these are factual questions which cannot be resolved on demurrer. (*McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1978) 21 Cal.3d 365, 374, fn. 6 [146 Cal.Rptr. 371, 578 P.2d 1375].) Appellants' allegations that Virgie was admitted to the center as a conservatee and that each respondent physician had some role in her treatment there constitutes a sufficient allegation of duty for the purposes of the complaint. Similarly, the allegation that respondents knew of her proclivity toward "irresponsible sexual behavior" is a sufficient averment of foreseeability.

Although respondents' alleged negligence in failing to make contraceptive counseling and medication available, or to diagnose the pregnancy earlier, is possibly actionable, solicitude for mental patients' rights of reproductive choice must also govern the manner in which appellants are permitted to prove causation. Thus, with respect to the former omission, Virgie must show that had contraceptive care been available she would have taken advantage of it and that it would have been effective. Regarding the failure to diagnose the pregnancy, she must show either that she would have consented to an abortion or, if she lacked capacity to consent, that her conservator would have been able to make to a court the type of extraordinarily strong showing which would permit the court to authorize this surgery. (*Maxon* v. *Superior Court, supra,* 135 Cal. App.3d 626.) If she should prevail on either of these theories, she is entitled to general and special damages for wrongful birth in accordance with *Custodio* and *Stills.*

 Virgie also contends she incurred general and special damages as a consequence of the lack of prenatal care during the pregnancy due to respondents' failure to diagnose her condition. Even if she is unable to establish that the birth itself is a proximate result of respondents' negligence, she may be able to recover damages caused specifically by negligent deprival of prenatal care.

The complaint also seeks punitive damages. This prayer is based only upon a conclusory allegation that respondents' conduct "constitutes a wilful and reckless and wanton disregard of the possible consequences to plaintiff." As detailed in the complaint, respondents' acts and omissions do not support this characterization. Consequently, no exemplary damages will be available here. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890 [157 Cal.Rptr. 693, 598 P.2d 854]; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218].)

As we have seen appellants' complaint is deficient in numerous respects. Nonetheless, a complaint survives a demurrer if it states "facts disclosing some right to relief." (*Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 22 [157 Cal.Rptr. 706, 598 P.2d 866]; see also *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 673 [170 Cal.Rptr. 484, 620 P.2d 1032].) "We approach this problem with recognition of the well accepted principle that . . . upon a consideration of all the facts stated it must appear plaintiff is entitled to some relief, notwithstanding that the facts may be inartfully stated, or may be intermingled with a statement of other facts irrelevant to the cause of action, or plaintiff may demand relief to which he is not entitled under the facts alleged." (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 123 [109 Cal.Rptr. 799, 514 P.2d 111]; see also *Pollack* v. *Lytle* (1981) 120 Cal.App.3d 931, 939-940 [175 Cal.Rptr. 81].) Certain aspects of respondents' alleged conduct are not actionable; further, the facts pleaded do not permit the recovery of

punitive damages. However, the allegations that Virgie suffered general and special damages as a consequence of respondents' negligent failure to make contraceptive care available, to diagnose her pregnancy within a reasonable time, and to provide prenatal care do state a cause of action. Consequently, it was error for the court to sustain the demurrers with respect to the first cause of action.

## IV.

 Reffie Foy's cause of action for wrongful life charges respondents with the same negligent conduct as his mother's wrongful birth action. For the reasons discussed above, the only aspects of respondents' conduct which are conceivably actionable are the failure to make available contraceptive counseling and care and the failure to make a timely diagnosis of the pregnancy (and consequently to provide prenatal care). Nonetheless, the complaint does not allege that Reffie has suffered any legally cognizable injury as a consequence of respondents' conduct.

*Turpin* v. *Sortini, supra,* 31 Cal.3d 220, permits an infant to maintain a "wrongful life" action for special damages only where respondents have failed to diagnose and warn the parents of the probability that an infant will be born with a hereditary ailment or disability and the infant is in fact born with that ailment. (See also *Call* v. *Kezirian, supra,* 135 Cal.App.3d 189.) This complaint fails to allege satisfactorily either of these elements. No reasons are alleged on the basis of which respondents should have discouraged and prevented the pregnancy, other than the fact Virgie was adjudicated as incompetent. There is no allegation of any hereditary trait or other physiological condition which should have led respondents to predict that a child conceived by her would be born impaired. Our society has repudiated the proposition that mental patients will necessarily beget unhealthy, inferior, or otherwise undesirable children if permitted to reproduce. (See *Maxon* v. *Superior Court, supra,* 135 Cal.App.3d 626, 632.) The complaint does not hint that respondents would have had any legitimate apprehension that Virgie's child would not be healthy and normal.

Reffie alleges—inadequately, as we have seen—that he "stood to be born physically or mentally impaired." He fails to allege that he actually was born "impaired." It appears that the injury of which Reffie complains is simply that of being born to an incompetent mother who is unable to care properly for him. That injury is not actionable. Reffie insists that he is seeking damages for a genuine impairment distinct from emotional injury. Yet his characterization of these injuries, like his statement of the risk allegedly created by respondents' conduct, begins and ends with the fact of his mother's incompetence: "The logical conclusion is that Reffie was born with some defect of body and mind because of his parentage." There is no attempt to describe the "intangible

deficits" with which Reffie has been born. Thus, the complaint fails in its most essential function—informing the adverse parties and the court of the subject matter of the suit.

An examination of the three sets of complaints and memoranda in opposition to demurrers, and of appellants' opening and reply briefs, does not suggest that he is aware of any more specific reason than his mother's status as a conservatee for preventing her pregnancy. Further, though he asserts he has suffered a physicial injury of some type, he does not indicate that he has actually been born with a congenital disability. There is no reasonable possibility Reffie will be able to amend the complaint to satisfy the elements of *Turpin*; consequently, his wrongful life action is barred.

Reffie has argued that a liberal construction of the complaint suggests the possibility that his alleged physical injury is a consequence of respondents' negligent failure to diagnose his mother's pregnancy and enable Virgie to receive ordinary prenatal care. Nonetheless, the allegation "injured in body and mind" remains insufficient. As Reffie made no effort to describe with particularity his physical and mental injuries and to allege facts indicating a causal connection between these injuries and the absence of prenatal care, the court properly sustained the demurrers with respect to this cause of action. Ordinarily, a court should sustain a demurrer with leave to amend where it appears reasonably possible plaintiff can cure by amendment defects in the complaint. (See *Skopp* v. *Weaver* (1976) 16 Cal.3d 432 [128 Cal.Rptr. 19, 546 P.2d 307]; *Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113 [113 Cal.Rptr. 102, 520 P.2d 726].) Here, however, counsel for Reffie expressly declined the opportunity to make any further amendments to this cause of action. "We are satisfied . . . with the first four causes of action the way they are, your Honor." As Reffie chose to stand upon the complaint, the court properly sustained without leave to amend respondents' demurrers with respect to the second cause of action and dismissed Reffie's claim. (*Hooper* v. *Deukmejian* (1981) 122 Cal.App.3d 987, 994 [176 Cal.Rptr. 569]; *Baldock* v. *Green* (1980) 109 Cal.App.3d 234, 238 [167 Cal.Rptr. 157]; *Richard P.* v. *Vista Del Mar Child Care Service* (1980) 106 Cal.App.3d 860, 865 [165 Cal.Rptr. 370].)

The judgment of dismissal is affirmed with respect to the second through sixth causes of action; as to the first cause of action it is reversed.

Caldecott, P. J., concurred.

**POCHÉ, J.**—I concur fully in the judgment and also concur in the reasoning of parts I, II and IV of the majority opinion.

My view of appellant Virgie Foy's pleading of "wrongful birth" is less charitable than that of my colleagues. I wish to emphasize therefore that my vote of concurrence to reverse the judgment of dismissal with respect to the uniformly vague allegations of "wrongful birth" is limited to agreement that respondent's alleged negligence in failing to make contraceptive counseling and medication available, or to diagnose the pregnancy earlier, is *possibly* actionable. Appellant's vague pleading (e.g., of causation-in-fact) suffices here against the general demurrer but is now open to attack by more effective pleading and discovery tools which are designed to determine whether, for example, she would have taken advantage of contraceptive care had it been available.

On April 15, 1983, the opinion was modified to read as printed above.